AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

625 Jane Street NE, Albuquerque NM 87123

)
)
)
)
)
)

Case No. **22 MR 1681**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference)

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 | Distribution and possession with intent to distribute controlled substances; |
| 21 U.S.C. 846 | Conspiracy to distribute and possess with intent to distribute controlled substance |

The application is based on these facts:

The affidavit of Special Agent Jared Shupla is incorprated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Shupla, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__ Telephonically Sworn and Electronically Signed __ *(specify reliable electronic means).*

Date:  November 9,  2022

City and state:  Albuquerque, New Mexico

_____
*Judge's signature*

Honorable Jerry H. Ritter, Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Jared Shupla, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search and seizure for the items described in Attachment B found in the following TARGET LOCATION, further described in Attachment A: 625 Jane Street NE Albuquerque NM 87123 (TARGET LOCATION).

2.      I am a Special Agent (SA) with the Bureau of Indian Affairs (BIA) United States Department of the Interior currently assigned to the Division of Drug Enforcement, and as such is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 and Title 21, of the United States Code, that is , an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18 and Title 21 of the United States Code, including violations which occur on Indian Reservations, also known as Indian Country, within the special Maritime and Territorial Jurisdiction of the United States.

3.      I began my law enforcement career in 2002 when I enlisted into the United States Army Serving Honorably for 8 years active duty as a Military Policeman. I attended my One Station Unit Training (OUST) in Ft. Leonard Wood Missouri. I successfully completed Basic

Combat Training and Advanced Individual Training in the field of Military Police. I received over 500 hours of law enforcement training techniques, focusing on investigative techniques, patrol skills, report riding, emergency vehicles operators' course, convoy security techniques, forward operating Prisoner of War operations and Military Operations in Urban Terrain (MOUT). While serving in the US Army I have served as a Patrolman, Patrol Supervisor, Vehicle Coordinator, Driver, Team Leader, Squad Leader and Desk Sergeant.

4.      After Honorably Discharged from the US Army, in October 2010 I was employed with the Pueblo of Acoma Police Department as a Patrolman. I attended and graduated from the Federal Law Enforcement Training Center Land Management Patrol Techniques class, where I served as squad leader. I investigated crimes ranging from but not limited to DUI's, assaults, Domestic Violence's, vehicle collisions, death investigations, Archeological violations etc.

5.      In May 2012 I was employed by the Santa Clara Tribal Police Department where I served as a Police Officer. As a Police Officer with Santa Clara Tribal Police Department, I upheld and enforced the laws and tribal customs of the Santa Clara Pueblo. I protected the property and lives of community members by patrolling assigned areas and addressed any suspicious individuals. I served as the Indian Highway Safety Officer for the Santa Clara Police Department. I enforced all traffic laws set forth by the Santa Clara Tribal Code within the exterior boundaries of the Santa Clara Pueblo which included intercity roads of the City of Espanola as well as the county roads of Rio Arriba County. I responded to and investigated allegations of DUI's and investigated traffic collisions. I've coordinated and oversaw the operation of several DUI checkpoints. I served as a liaison for the Santa Clara Tribal Police Department in collaboration

with the Rio Arriba DWI Program. I've compiled statistics for all traffic stops, DUI arrests, traffic collisions and citations issued by the Tribal Police Department for the DWI program.

6.      In October 2016, I became a Federal K9 Officer with the BIA Division of Drug Enforcement. I conducted both inter-city and highway interaction of vehicle and individuals responsible for human trafficking, transportation of illegal narcotics, illegal weapons, and large sums of U.S. Currency into the Native American Reservations and off Native American Reservations. I have conducted multiple investigations relating to violations of the Major Crimes Act as well as federal narcotic violations to include but not limited to illicit drugs and marijuana cultivation within Indian Country Those investigations range from misdemeanors to felony cases. I've conducted several criminal narcotics investigations in my respective assigned duty station and have issued summons through the Central Violations Bureau (CVB) I have successfully completed a 4-week K9 handlers' course in Muskogee, Oklahoma. I was trained to detect the change in behavior of my K9 partner which led to the detection of narcotics.

7.      I am currently assigned to the Albuquerque Office Division of Drug Enforcement of the BIA as a Special Agent and have primary investigative responsibility in federal drug violations occurring in Indian Country. I am also a Task Force Officer with the Department of Homeland Security Albuquerque Office. I have completed the 7-week Department of the Interior Investigators training program in Brunswick, Georgia, I have received training on conducting long term investigations, crime scene processing, surveillance, report writing, control tactics and crime scene photography.

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

9.      Your affiant believes there is probable cause that an unknown male has committed, is committing, and will continue to commit offenses involving violations of, *inter alia*:

   a.  21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances.

   b.  21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances.

## EVIDENCE SOUGHT DURING SEARCH

10.     Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer

has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

11.     Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

12.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

13.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records

5

can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

14.     Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

15.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

16.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and

other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

17.     Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

18.     Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

19.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic

7

banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

20.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

21.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information

stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

22.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

23.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms

and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

24.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

25.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

26.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy

evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

27.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

28.     A list of items agents seek authority to seize is in Attachment B.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the TARGET LOCATION, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the TARGET LOCATIONS, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

30.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware

and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

### October 26, 2022, Controlled Delivery of Fentanyl

32. On Wednesday, October 26, 2022, law enforcement intercepted 11.4 kilograms of fentanyl enroute to Albuquerque. The courier (referred to herein as Cooperating Source or CS) agreed to complete a controlled delivery. Law Enforcement personnel attempted to conduct a controlled delivery of approximately 11.4 kilograms of "sham" fentanyl to unknown individuals. Sham is normally a substance or material designed to look like a controlled substance, but is fake (e.g., flour, baking powder, etc.). In this case HSI used new plastic surgical gloves, tucked inside

13

a plastic bag, layered in duct tape, and wrapped in black electrical tape to resemble 12 fentanyl bundles. The sham fentanyl was to be delivered to an unknown person. Before the sham narcotics delivery, an HSI Under Cover Agent (UCA) along with the assistance of the CS arranged to meet this unknown male in Albuquerque on October 26, 2022, to complete the delivery of sham narcotics in exchange for approximately $47,000.00.

33.     Initially, the CS called the supplier who he referred to as "CHAPO." Chapo told the CS to meet with the unknown male at the La Quinta Inn located at 2011 Menaul Blvd. in Albuquerque, NM. However, the UCA advised the CS to call the unknown male and change the location of the sham narcotics delivery to the Walmart located at 2701 Carlisle Blvd NE in Albuquerque, NM. The UCA and CS were parked at the northeast parking lot of Walmart. Upon the arrival of the unknown male at approximately 1434 hours the unknown male advised the CS he was about to arrive and that he was operating a white Cadillac. Shortly after the white Cadillac arrived and was being operated by a male thought to be, its registered owner, Armando JIMENEZ, along with an unknown female passenger. The CS exited his vehicle and got into the white Cadillac bearing New Mexico license plate UNM45397. UCA confirmed that the delivery was completed at which point the signal was given to take the suspects into custody.

34.     The unknown male, later identified as Eric JARAMILLO, resisted arrest by evading law enforcement and fleeing from the Walmart parking lot in the white Cadillac. The CS was able to jump free from the moving vehicle unharmed. A New Mexico State Police helicopter observed the white Cadillac as it fled from the scene. After leaving the Walmart Parking lot on Carlisle Blvd NE, the white Cadillac made its way to Interstate 40 and proceeded east bound on Interstate 40. The white Cadillac was observed driving at a high rate of speed, ultimately departing Interstate 40

onto Eubank Blvd., and making its way to the area of the Extra Space Storage. While in proximity of the Extra Space Storage, the white Cadillac was observed making a U turn on Eubank, heading north, and entering westbound Interstate 40. The white Cadillac stopped on Interstate 40 westbound near the Eubank exit. JARAMILLO exited the vehicle and fled on foot into the drainage tunnels that parallel Interstate 40. It was later ascertained that the unknown female passenger was dropped off in the parking garage of Target located at 2120 Louisiana Blvd NE out of the view of the pursuing agents and helicopter. She was later viewed on surveillance video hastily walking into Target with a black backpack. A K9 track of the immediate area was conducted and then inside the tunnels which the unknown male was located.

35.   The white Cadillac was found to be registered to Armando JIMENEZ. Law enforcement agents obtained a copy of JIMENEZ driver's license photograph, and it was later confirmed as described below, that the driver was not JIMENEZ, but rather, Eric JARAMILLO.

36.   Law Enforcement agents compared known photographs of JARAMILLO, helicopter video, and Extra Space Storage surveillance video.

37.   On October 26, 2022, an inventory of the white Cadillac was completed.

a.   On October 26, 2022, agents who were pursuing JARAMILLO in the tunnels paralleling Interstate 40, noticed a single set of footprints leading from inside the tunnel, out of a culvert, and up toward an empty parking lot area in the 600 Juan Tabo Blvd. NE block. This is approximately a six-minute (.3 miles) steady walk or an even shorter run to JARAMILLO's residence at 625 Jane Street NE, Albuquerque, New Mexico.

b. On October 26, 2022, SA J. Johnson observed a male running and jump a wall in the 600 Juan Tabo Blvd. NE block wearing a black shirt and dark pants. Later, SA Johnson was shown a picture of JARAMILLO, he identified the runner as JARAMILLO and stated he was looking for a male in a white shirt with dark pants.

c. A receipt for Extra Space Storage in the amount of $270 and dated for October 25, 2022, was located between the driver's seat and center consol. This is the location agents believe JARAMILLO intended on going to escape pursuing law enforcement.

d. On November 2, 2022, agents served a subpoena to the Extra Space Storage to ascertain who had rented the storage unit. The storage unit is leased in the name Isaac Joseph VALDEZ III who agents believe to be a relative of JARAMILLO. After viewing security footage of the storage unit office on the day of the lease, agents observed JARAMILLO paying in cash for the storage unit.

e. On November 2, 2022, agents viewed the Extra Space Storage parking lot surveillance camera footage from October 25, 2022, and observed JARAMILLO get into the white Cadillac involved in the October 26th pursuit.

f. Photo comparison between the helicopter video and the Extra Space Storage surveillance videos show that the two males are the same person who has been identified as JARAMILLO.

g. On November 7, 2022, JARAMILLO's New Mexico Driver's license was showed to the Extra Space Storage manager who identified JARAMILLO as the individual he had just encountered outside of storage unit G-1 at approximately 1230 hours.

h.   Law enforcement record checks revealed JARAMILLO resides at the TARGET LOCATION. These record checks include Administrative Office of Courts records and Voter Registration home of record.

**Trash Pull at TARGET LOCATION**

38.   On November 7, 2022, at approximately 1000 hours, agents conducted surveillance at 625 Jane Street NE. While conducting surveillance of the home agent observed it was trash day for the neighborhood and conducted a "trash pull." A trash pull is when a law enforcement agent or officer grabs the trash from the trash receptacle when it is put at the street for garbage pickup.

39.   Agents grabbed two white garbage bags out of the trash receptacle and departed the area to an empty parking lot down the street. Agents opened the white garbage bags and took notice of multiple Ziplock gallon bags, unopened mail, and multiple receipts.

40.   In one Ziploc gallon bag there was a yellow crystalline substance, later tested using the MX 908 Mass Spectrometer positive for Acetaminophen and Paracetamol and weighted .70 kilograms. In a second Ziploc gallon bag there was a light blue crystalline substance, later tested using the MX 908 Mass Spectrometer positive for Acetaminophen and Paracetamol and weighted .95 kilograms.

41.   In my training and experience these types of substances are cutting agents to making fentanyl. These are common cutting agents in recreational drugs and are often found in heroin and high-end fake oxycodone tablets or fentanyl. It is also notable that Acetaminophen and Paracetamol in such quantities is not often used by a common household, rather, are usually associated on a pharmaceutical scale.

17

42.    Based on the above information there is probable cause to believe that items listed in Attachment B will be located in TARGET LOCATION.

43.    This Affidavit has been approved by Assistant United States Attorney Joseph Spindle.

## CONCLUSION

44.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET LOCATION described in Attachment A to seek the items described in Attachment B as containing evidence of violations of 21 U.S.C. § 841 and §846.

Respectfully submitted,

Jared Shupla
Special Agent
Bureau of Indian Affairs

Telephonically sworn and electronically signed
on November 9, 2022:

THE HONORABLE JERRY H. RITTER
UNITED STATES MAGISTRATE JUDGE

18

## ATTACHMENT A

    **1.**     The **TARGET LOCATION** is located at 625 Jane Street NE, Albuquerque New Mexico 87123.  This is a residential home that has a brown door and a lock on the left side. The TARGET LOCATION has a single car garage and white stucco. The TARGET LOCATION has 3 bedrooms and 2 bathrooms with a total of 1500 square feet of living space. The home is on a 5,998 square foot lot. 625 is displayed on the left side of the front door.
    **2.**     This warrant would authorize the search of all outbuildings, appurtenances, and any and all vehicles at and associated with the **TARGET LOCATION** at the time of the search.

    **3.**     Photo 1, below, is an aerial view of **TARGET LOCATION** and its surroundings. Photo 2, below, shows the front of the **TARGET LOCATION**.

**Photo 1**



**<u>Photo 2</u>**



## ATTACHMENT B

Evidence related to the unlawful distribution of and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, including:

1. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

2. Paraphernalia for packaging cash drug proceeds including heat sealing devices, plastic packaging for cash, rubber bands, and money-counting devices;

3. Books, records, receipts, notes, ledgers, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

4. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to distribution of controlled substances;

5. Books, records, receipts, notes, ledgers, airline tickets, money orders, wire transfer or money remittance records, and other information related to the receipt, expenditure and concealment or other disposition of income;

6. Cash, currency, financial instruments, and records relating to drug-trafficking income and expenditures of proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug-trafficking activities;

7. Photographs of individuals associated with the distribution of drugs, and of their property and their drugs;

8. Records and information reflecting names, nicknames, addresses, and telephone numbers of both current and past drug associates;

9. Safes, keys for safety-deposit boxes, hidden compartments and other secure locations, which often contain the proceeds of narcotics-trafficking activity, including, but not limited to, large amounts of United States currency;

10. Canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents and keys;

11. Records and information concerning occupancy or ownership of the **TARGET LOCATION** (described in Attachment A), such as utility and telephone bills, mail envelopes, leases, or addressed correspondence.

12. Seizure of cellular telephones;

13. Seizure of computers, tablets and other electronic devices;

14. Records and information depicting subscriber data and itemized telephone calls to other potential drug traffickers from residential telephone and cellular telephones;

15. Records and information indicating ownership, association, and utilization of vehicles, to include maintenance and improvements to the vehicles.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.